UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLARENCE EVANS,

          Plaintiff,

v.

INTERLAKE STEAMSHIP COMPANY,

          Defendant.
_____/

CASE NO. 07-12322

HON. MARIANNE O. BATTANI

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Interlake Steamship Company's (Interlake) Motion for Summary Judgment brought pursuant to Fed.R.Civ.P. 56(c) (Doc. No. 20). The Court heard oral argument on October 22, 2008. At the conclusion of the hearing, the Court ordered the parties to facilitation, which took place January 29, 2009. Because the parties failed to facilitate their claims successfully, the Court enters its ruling on the pending motion. For the reasons that follow, Defendant's motion is DENIED.

**I. STATEMENT OF FACTS**

Plaintiff Clarence Evans filed this action pursuant to the Jones Act, 46 U.S.C. § 30104, and under General Maritime law for unseaworthiness and for maintenance and cure, after he was injured while working for Defendant on its ship, the SS Kaye E. Barker. In addition to the captain and first mate, the crew included four General Purpose Maintenance - Rated (GPMRs) crew members and two deckhands. Each work day the crew met and received a list of assignments from the Mate. The Mate did not specify how

to perform the tasks assigned or who should perform them; those decisions were left to the GPMRs and deckhands.

On the day of Evan's injury, May 4, 2006, three GPMRs--Evans, Derek Wirgau, Jeff Chabot, and two deckhands were on duty. First Mate Stephen Pentces, assigned two tasks: inspect cargo hold chains; and, move cargo nets from the ship's main deck to its stack deck, located two decks above the main deck.  The cargo nets were used for discharge operations at the Lambton Generating Station in Canada, and were not needed for the remainder of the 2006 sailing season.  Each net weighs approximately 250 pounds. Pentces provided no direction as to how these tasks were to be accomplished.

After the assignment meeting concluded, the deckhands went to work on the cables in the cargo hold.  Evans, Wirgau, and Chabot rinsed the cargo nets with a high pressure hose and waited for the nets to dry.  The three GPMRs eventually decided that the vessel's grocery hoist should be used to move the cargo nets.  Def.'s Ex. I, Chabot Dep. at 26.  In this way, the GPMRs, several of whom had bad backs, and one of whom had a hernia, would not have to carry the nets.

The hoist was used to bring groceries and luggage aboard.  The GPMRs intended to secure the grocery hoist's cable to a line wrapped around the cargo net, and affix a tag line to the load to prevent the net from swinging back-and-forth as it was being raised from the main deck to the stack deck.

According to Plaintiff, after the cargo nets were rolled into an oval shape, Chabot used a canal line as a tag line, which he wrapped around the net, knotted, and then secured the other end of the line to a cleat attached to the gunwale on the side of the ship.

Id. at 27. Evans and Chabot were to lift and push the cargo net over the side; Chabot would operate the grocery hoist; and Wirgau would handle the canal/tag line. Id. at 42. Although the facts are disputed as to who secured the canal/tag line to the cleat, it is undisputed that as Chabot and Evans pushed the net over the side of the ship, Wirgau lost control of the tag line. When Wirgau called for help, Evans responded and grabbed hold of the line, and his hand was pulled into and crushed in the cleat. Ex. H, Evans Dep. at 80. Evans suffered a severe crush amputation.

## II. STANDARD OF REVIEW

Under Rule 56(c), a court should grant a motion for summary judgment only if the evidence indicates that no genuine issue of material fact exists. To avoid summary judgment, the opposing party must set out sufficient evidence in the record to allow a reasonable jury to find for him at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). A court tests the sufficiency of the evidence against the substantive standard of proof that would control at trial. Anderson, 477 U.S. at 248.

The moving party must show that there is an absence of evidence to support the non-moving party's case. Celotex v. Catrett, 477 U.S. 317, 325 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. A court disposing of a summary judgment motion must consider the evidence in the light most favorable to the non-moving party. Matsushita, 475 U.S. 574.

### III. ANALYSIS

#### A. Negligence under the Jones Act

To succeed under the Jones Act, Evans must show that Defendant failed to provide him with a reasonably safe place to work. In addressing the merits of Defendant's argument, the Court is mindful that its task is to determine whether Plaintiff has presented more than a scintilla of evidence on the element of negligence. In assessing the evidence, the Court acknowledges that even if Plaintiff's own negligence caused his injury, recovery is not barred because maritime law espouses a system of comparative negligence in which the plaintiff's damages are merely reduced by the plaintiff's degree of fault. Miller v. American President Lines, Ltd., 989 F.2d 1450, 1459-63 (6th Cir. 1993).

"A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances." Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997). Such circumstances include not only the employee's reliance on his employer to provide a safe working environment, but also the seaman's experience, training or education. Id. Courts have held there is "no duty to instruct an experienced seaman on matters within common sense, or to remind him of what he already knew or should have known." Cole v. Dolphin Towing, LLC, 2005 WL 195519, *7 (E.D. La. Jan 27, 2005) (trial resulted in a no cause because the plaintiff, who was injured throwing a heavy line, testified he had done it on numerous occasions and despite his lack of training, he could throw like a trained deckhand) (citing Vendetto v. Sonat Offshore Drilling Co., 725 So.2d 474 (La. 1999)).

Nevertheless, Defendant has the duty to promulgate and enforce safety rules, and

evidence of its failure to do so may be considered by the finder of fact in assessing the employer's negligence. Ackley v. Chicago and North Western Transp. Co., 820 F.2d 263 (8th Cir. 1987) (addressing the same standard employed in a FELA action). Here, there are factual issues relative to whether Defendant should have but failed to provide documented work and safety procedures for deck operations, specifically as to use and handling of cargo nets and the grocery hoist. In addition, there is no dispute that First Mate Pentces did not provide any supervision, training, or instruction as to how to perform the task when he met with the crew, that he never asked whether any of the GPMRs had experience or training relative to the task, and that he knew that the job would require at least five men. The owner of a vessel has a clear duty to supervise the work of a seaman under his command and may be chargeable with the knowledge, or lack of knowledge, of his employees. Olsen v. States Line, 378 F.2d 217 (9th Cir. 1967). "The duty to supervise is not limited merely to the green, inexperienced seaman but extends to those jobs which require concerted efforts of crew members." Smith v. Flowers Transp., Inc., 377 F. Supp. 1112 (D.C. Miss. 1974). Compare Peymann v. Perini Corp., 507 F.2d 1318, 1321 (1st Cir.1974) (finding no liability where the ship's officer conducted his own activity in a negligent manner when he slipped off an oily pipe rail instead of using a stepladder).

### B. Seaworthiness of the SS Kaye E. Barker

A shipowner has an absolute duty to provide a seaworthy vessel, and this duty extends beyond the physical integrity of the vessel and its equipment to such other circumstances as the procedures crew members are instructed to use for assigned tasks. Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 7 (1st Cir. 2001) (citing Vargas v.

McNamara, 608 F.2d 15, 18 (1st Cir. 1979)), for the proposition that "a jury could conclude that the vessel was unseaworthy due to the unsafe procedure crewm[e]n were directed to employ for cleaning the engine room"). Accord Mitchell v. Trawler Racer Inc., 362 U.S. 539, 550 (1960) (noting that a warranty of seaworthiness is an absolute duty owed by a ship owner to its crew and, in this case, to its insurer, to provide "a vessel and appurtenances reasonably fit for their intended use").

Defendant correctly notes that the misuse of properly functioning equipment may render a vessel unseaworthy, provided "the misuse occurs at the direction of a superior." Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 904 (6th Cir. 2006) (citation omitted). Accord Morales v. City of Galveston, 370 U. S. 165, 170 (1962) (vessel may be unseaworthy because its crew was instructed to use unsafe work methods). In this case no supervisor order the method employed by Plaintiff to move the cargo nets and no supervisor limited three men to the assignment. Consequently, Defendant concludes that it is entitled to summary judgment on the seaworthiness claim.

This argument is unavailing. Here, Plaintiff does not claim that he was ordered to perform his tasks in an unsafe method; rather, he asserts that neither he nor his fellow GPMRs were trained as to how to perform the task.

In the alternative, Defendant argues that Evan's claim fails as a matter of law because it is undisputed that the equipment used was not defective. His injury report and deposition testimony confirm this position.

Evan's injury report, which was completed before he was removed from the vessel for medical care, provides relevant but not dispositive evidence. It includes the following

request: "If you claim that there were any unsafe conditions that caused the incident, such as weather, lighting, defective or absent equipment, etc., describe them here. If there were none, write "none" here." Def.'s Ex. A. The answer "none" appears. Id.

Although this report is consistent with Plaintiff's deposition testimony, in which he conceded that he knows of no facts whatsoever supporting a claim that there was inadequate or defective equipment onboard the ship, the evidence does not resolve the matter. Evan's claim is not based on the adequacy of equipment. Rather, he alleges that Defendant failed to provide documented work and safety procedures for the deck operations Evans was ordered to perform. Specifically, the ISO/ISM Safety and Training Manual, Management Operations Manual, and Deck Department Operations Manual, did not address the use, handling, and stowage of the vessel's cargo nets and grocery hoist. He maintains that the failure to promulgate and enforce appropriate work and safety procedures led to his injury. Further, Plaintiff raises the availability of equipment needed to do the job safely. Specifically, he presents evidence that the GPMRs originally planned on using a "block and tackle" arrangement to move the cargo nets, which would not have required throwing the nets overboard. The plan was abandoned because the proper equipment could not be located. Def.'s Ex. K at 56. According to Plaintiff, even if the necessary equipment was on the ship, it had to be provided to the seamen when and where the work was to be done.

Violations of safety regulations can lead to findings of unseaworthiness, see Manning v. M/V "Sea Road, 417 F.2d 603 (5th Cir. 1969), as can the failure to adequately train a ship's crew, see Hercules Carriers, Inc. v. Claimant State of Florida, 768 F.2d 1558

(11th Cir.1985).  In addition to the claims arising out of the absence of safety regulations, Evans contends that he had not been trained in the use of the hoist, or in methods on how to roll, transport, and store the cargo nets.  He further maintains that he had not performed this task in the past.  Evans relies on the asserted incompetence of the Captain and First Mate for their failure to document and publish appropriate and sufficient work and safety procedures and to supervise jobs requiring the concerted efforts of crewmembers.  See Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir. 1988) (noting that a vessel is unseaworthy when there is an unsafe method of work, such as a lack of proper equipment and manpower to perform a task); Weeks v. Alonzo Cothron, Inc., 466 F.2d 578, 581 (5th Cir. 1972) (addressing the failure to require the use of safety procedures or equipment that would have prevented the injury); Morales v. City of Galveston, 370 U.S. 165, 170 (1962) (noting that the use of an improper method of storage or unloading cargo may render a vessel unseaworthy).  Viewed in the light most favorable to Plaintiff, the Court finds he can proceed on his claim of unseaworthiness.

### C. Maintenance and Cure

Maintenance refers to a shipowner's obligation to provide food and lodging to a seaman injured while in service of the ship, whereas cure involves the duty to provide necessary medical care and attention.  See Al- Zawkari v. American S.S. Co., 871 F.2d 585, 586 n. 1 (6th Cir. 1989).  A shipowner is liable to pay maintenance and cure to the point of maximum cure, that is, when the seaman's affliction is cured or declared to be permanent.  See Farrell v. United States, 336 U.S. 511, 517-19 (1949).

Defendant asserts that it has complied fully with its obligations to Plaintiff because

Thomas H. Beird, M.D., a board certified orthopedic surgeon specializing in plastic, hand and cosmetic surgery, declared Evans had reached MMI on January 30, 2008. Until that time, Interlake made cure payments in the amount of $92,850.86, and maintenance benefits payments in the amount of $66,223.74.

After Evans failed to regain anticipated function, Dr. Beird revised his opinion and recommended additional surgery, which was scheduled to take place July 15, 2008. He submitted an explanatory report dated July 23, 2009. Pl.'s Ex. M. Defendant challenges the July 23, 2008, letter as unauthenticated, and argues that the letter does not show that Dr. Beird withdrew his medical conclusion. According to Defendant, the letter merely reflects that Plaintiff was unhappy with the regained function and additional surgery was scheduled.

The cut-off point for maintenance and cure is "a medical determination of permanency. . . ." Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 202 (1st Cir. 1980) (citing Vella v. Ford Motor Co., 421 U.S. 1, 4 (1975)). The determination should be unequivocal to terminate the right to maintenance and cure. Id. at 202. Doubts or ambiguities to a seaman's right to receive maintenance and cure must be resolved in favor of the seaman. See Vaughn v. Adkinson, 369 U.S. 527 (1962).

In viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact to whether maintenance and cure should have been reinstated.

## IV. CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendant's motion.

**IT IS SO ORDERED.**

                                                      s/Marianne O. Battani
                                                      MARIANNE O. BATTANI
                                                      UNITED STATES DISTRICT JUDGE

Date:   March 12, 2009


## CERTIFICATE OF SERVICE

A copy of this Order was mailed and/or electronically filed to counsel of record on this date.

                                                        s/Bernadette M. Thebolt
                                                      Deputy Clerk